# EXHIBIT 11

```
 1              UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON

 3                     AT SEATTLE
      _____
 4
     BUNGIE INC.,                    )
 5                                   )
             Plaintiff,              )
 6                                   )
        v.                           ) No. 2:22-cv-371-MJP
 7                                   )
     NICHOLAS MINOR a/k/a "LORD      )
 8   NAZO,"                          )
                                     )
 9           Defendant.              )

10    _____

11      VIDEOTAPED VIDEOCONFERENCE DEPOSITION UPON

12                 ORAL EXAMINATION OF

13                  NICHOLAS MINOR
      _____
14

15                   10:02 A.M.

16                 JULY 20, 2023

17            SAN FRANCISCO, CALIFORNIA

18

19

20

21

22

23

24

25   REPORTED BY:  ABIGAIL F. MARKSON, CCR 3461
```

```
 1                A P P E A R A N C E S

 2            (ALL PARTIES APPEARING REMOTELY)

 3

 4   FOR THE PLAINTIFF:

 5           DYLAN M. SCHMEYER
             THOMAS NEVILLE
 6           MIKE DUNFORD
             Kamerman, Uncyk, Soniker & Klein
 7           1700 Broadway, 16th Floor
             New York, New York 10019
 8           719.930.5942
             dschmeyer@kusklaw.com
 9

10   FOR THE DEFENDANT:

11           BRIAN H. GETZ
             Law Office of Brian H. Getz
12           90 New Montgomery Street
             San Francisco, California 94105
13           415.912.5886
             brian@briangetzlaw.com
14

15

16

17

18   ALSO PRESENT:

19           ROCCO FRANCO - VIDEOGRAPHER

20           DEBORAH GAYNOR

21           KAT FARLEY

22

23

24

25
```

```
 1                      I N D E X

 2

 3  EXAMINATION BY:                            PAGE

 4  MR. SCHMEYER                                 5

 5

 6

 7

 8  EXHIBITS FOR IDENTIFICATION

 9                                            Page
```

```
10  Exhibit 1    Bungie Limited Sofware License      30

11               Agreement

12  Exhibit 2    Lord Nazo YouTube Post              37

13  Exhibit 3    E-mail Thread, Jeremy Wiland        53

14               and YouTube, "Subject: YouTube

15               Copyright Complaing Submission"

16               1/25/22

17  Exhibit 4    Defendant's Responses to            56

18               Plaintiff's First Set of

19               Requests for Admissions

20  Exhibit 5    E-mail Thread, Damian Reynolds      62

21               and YouTube, "Subject: Re:

22               YouTube Copyright Complaint

23               Submission" 3/19/22

24  Exhibit 6    3/20/22 YouTube Comment Thread      63

25  Exhibit 7    3/26/22 @Lord_Nazo Tweet            65
```

1                    I N D E X (Continuing)

2    Exhibit 8      Lord Nazo YouTube Post              66

3    Exhibit 9      E-mail, "Subject: About Your        70

4                   Copyright Strikes" 3/22/22

5    Exhibit 10     Defendant's Answer to First         72

6                   Amended Complaint

7    Exhibit 11     1/26/22 @Lord_Nazo Tweet

8    Exhibit 12     3/16/22 @Lord_Nazo Tweet            78

9    Exhibit 13     Takedown Notice From Damian

10                  Reynolds

11   Exhibit 14     3/18/22 @Lord_Nazo Tweet

12   Exhibit 15     Reddit Post                         87

13   Exhibit 16     Source Code For Reddit Post

14   Exhibit 17     E-mail Thread, "Subject:            87

15                  Regarding Bungie Lawsuit"

16                  6/14/22

17   Exhibit 18     E-mail Thread, Damian Reynolds      91

18                  and David Thomson, "Subject:

19                  You're in for it now." 3/20/22

20

21

22   REPORTER'S NOTE: All quotations from exhibits are

23   reflected in the manner in which they were read into

24   the record and do not necessarily indicate an exact

25   quote from the document.

1          SAN FRANCISCO, CALIFORNIA; JULY 20, 2023

2                     10:02 A.M.

3                      --oOo--

4                  NOCHOLAS MINOR,

5     sworn as a witness by the Certified Court Reporter,

6                 testified as follows:

7

8               THE VIDEOGRAPHER:  This begins the

9   deposition of Nicholas Minor in the matter of Bungie

10  Inc. versus Nicholas Minor.  Today's date is July 20th,

11  2023, and the time on the monitor is 10:02 a.m.

12           My name is Rocco Franco, and I'm the

13  videographer.  The court reporter is Abby Markson, and

14  we are here with Hueseby Global Litigation.

15           Counsel, please introduce yourselves, after

16  which the court reporter will swear in the witness.

17               MR. SCHMEYER:  My name is Dylan

18  Schmeyer.  I am counsel for the plaintiff, Bungie Inc.

19  My pronouns are he and him.

20               MR. GETZ:  Brian Getz on behalf of the

21  deponent, who is seated to my right.  My pronouns are

22  he and him.

23               MR. NEVILLE:  And, I'm sorry.  I forgot

24  to do this when it was my turn.  My name is Thomas

25  Neville.  I'm working with Mr. Schmeyer for Bungie.  My

1  pronouns are he, him, and his.

2          And, Folks, if you're on the Zoom from the

3  firm, you will need to pop on briefly to --

4              MR. SCHMEYER:  Introduce yourselves,

5  please.

6              MR. NEVILLE:  -- introduce yourselves

7  for the record.

8              MS. FARLEY:  My name is Kat Farley.  I'm

9  a paralegal for Mr. Schmeyer.

10             MR. DUNFORD:  Mike Dunford.  I'm

11 Mr. Schmeyer's associate at Kamerman Uncyk.

12             MS. GAYNOR:  Deborah Gaynor.  I am

13 Dylan's law clerk.

14             MR. SCHMEYER:  All right.  Is the court

15 reporter ready?

16         All right.  We are on record.

17

18                      EXAMINATION

19  BY MR. SCHMEYER:

20     Q.  My name is Dylan Schmeyer.  I am counsel for

21  the plaintiff, Bungie Inc.  And my pronouns are he,

22  him, and his.

23         And would you mind stating your name for the

24  record, Mr. Minor?

25     A.  Nicholas Alan Minor.

```
 1      A.  Yeah.

 2      Q.  All right.  Very good.  Now, if you had to

 3  pick, like, a favorite game, like one -- one title, one

 4  favorite game, what would you pick?

 5      A.  Super Smash Bros.

 6      Q.  Right on.  Classic fighting game.  The

 7  original, do you have affection for?  Or is it one of

 8  the titles they've released since?

 9      A.  Right now it's Super Smash Bros. Ultimate.

10      Q.  Right on.  What's your favorite character to

11  play?

12      A.  Mii Gunner.

13      Q.  There you go.  I'm a Cloud guy myself just

14  because I'm not very good.  But it's -- it's a lot of

15  fun.  Right on.

16          Do you currently have a -- a YouTube account

17  that you're operating as of today?

18      A.  Yes.

19      Q.  What's the -- what's the username on that?

20      A.  Lord Nazo.

21      Q.  Right on.  Right on.  Same one.  Okay.

22          And do you have a Twitter account as we speak

23  here today?

24      A.  No.

25      Q.  All right.  Did you ever have one?
```

```
 1      A.   Yes.

 2      Q.   What was -- what was your username?

 3      A.   Lord_Nazo.

 4      Q.   All right.   @Lord_Nazo; is that correct?

 5      A.   Yes.

 6      Q.   Do you have -- do you have any memory of how

 7  long you had that account?

 8      A.   No idea.

 9      Q.   Was it -- did you -- did you have it for,

10  would you say, more or less than five years?

11      A.   Maybe, yes.

12      Q.   Would you say you had it more or less than

13  three?

14      A.   Yes.

15      Q.   So would it be fair to say that you -- you had

16  it for three to five years?

17      A.   Yes.

18      Q.   All right.   Very good.

19           Now, your YouTube channel, do you have any

20  other YouTube channels other than Lord Nazo?

21      A.   No.

22      Q.   So that's the one?

23      A.   Yes.

24      Q.   When did you first -- when did you first make

25  it?
```

1        Q.   Right on.   And what sort of music -- what sort

2   of music do you like?   Not just like to put up, but do

3   you like personally?

4        A.   Action-type music, orchestral.

5        Q.   Right on.   So instrumental?

6        A.   Yes.

7        Q.   Sweeping?

8        A.   Yeah.

9        Q.   Understood, man.   Understood.   That stuff can

10  get you hyped, right?

11       A.   Yeah.

12       Q.   Right on.   So when did you -- when did you --

13  if you can remember, when did you first start posting

14  tracks from -- from Destiny?

15       A.   2015.

16       Q.   2015.   Did you post like OST tracks or video

17  game tracks from any other games?

18       A.   Yes.

19       Q.   Would you say you posted tracks from any games

20  more than Destiny 2?   Do you have kind of like a

21  signature game that you like to post music from?

22       A.   No.

23       Q.   So how many tracks from Destiny 2 would you

24  say you posted?   How many videos would you say you've

25  made?   Let me rephrase.

1          How many videos would you say that you've made

2    featuring Destiny 2 music?

3          A.  At least 50.

4          Q.  At least 50.  Would you say more than a

5    hundred?

6          A.  I can't recall.

7          Q.  Understood.  So, um, how -- how popular are

8    your videos typically when you post Destiny 2 music

9    videos?

10         A.  They gain viewership, I guess, over time.

11         Q.  If you could pick out of your head a typical

12   video, like how many views would it have of Destiny 2

13   music?

14         A.  20,000.

15         Q.  Oh, wow.  Not bad at all.  20,000.  Is there,

16   like, one track that's more popular than the others?

17   Like, one set of videos or one specific video?

18         A.  I can't recall.

19         Q.  Fair enough.  What about, like, from a certain

20   soundtrack?  Do you think, like, there's a certain

21   soundtrack from the Destiny series that performs better

22   than the others?

23         A.  The original.

24         Q.  Right on.  Right on.  The classic?

25         A.  Yeah.

```
 1      Q.  Well, the viewers have taste.

 2          Do you have a monetization enabled?

 3      A.  No.

 4      Q.  All right.  Ever made any money from a YouTube

 5  channel?

 6      A.  Yes.

 7      Q.  How much would you say?

 8      A.  Less than 10,000.

 9      Q.  How much would you say you make in a typical

10  year?

11      A.  I can't recall.

12      Q.  So less than 10,000.  More than 5,000?

13      A.  Yes.

14      Q.  Would you say more than 7,000?

15      A.  No.

16      Q.  So somewhere between five and 7,000?

17      A.  Yes.

18      Q.  All right.  Fair enough.

19          Has your YouTube channel ever been taken down?

20      A.  Yes.

21      Q.  Was it -- was it over Destiny 2 content?

22      A.  Yes.

23      Q.  Has it ever been taken down for reasons other

24  than Destiny 2 strikes?

25      A.  No.
```

```
 1              And your -- you've played the sequel, Destiny
 2  2?
 3      A.  Yeah.
 4      Q.  When did you start playing Destiny 2?
 5      A.  When it first launched.
 6      Q.  Right on.  Kind of day one with that too?
 7      A.  Yeah.
 8      Q.  Well, very, very good.  All right.  When did
 9  you decide, as you started playing these games, that
10  you wanted to -- you wanted to make Destiny content?
11      A.  Through listening to the music, like,
12  throughout the games.
13      Q.  What was -- what was your thought process?
14  Why did you decide, I want to make Destiny content?
15      A.  Because I wanted to, like, listen to longer
16  versions of it.
17      Q.  Longer versions.  Tell me what you mean by
18  that.
19      A.  Like, extending it to making it longer with a
20  seamless sort of, like, loop, I guess.
21      Q.  Right on.  So you wanted to loop Destiny
22  tracks so you could listen to them?
23      A.  Yeah.
24      Q.  Make them longer?
25      A.  Yes.
```

1      Q.  Do you -- do you ever create, like, mash-ups,

2   like, loop together multiple tracks at once?

3      A.  Yes.

4      Q.  What's your favorite?

5      A.  Sepiks Prime and Sepiks Redux.

6      Q.  Very good.  When did -- when did you make that

7   one?

8      A.  A couple of years ago.  I can't recall.

9      Q.  A couple years ago?  Fair enough.

10     A.  Probably longer than that.

11     Q.  How much longer, would you say?

12     A.  I would say around the time Rise of Iron

13   launched in Destiny 1.

14     Q.  Okay.  How long did it take you to make it?

15     A.  A couple of days.

16     Q.  Now, what software do you use for your audio?

17     A.  Audacity.

18     Q.  Have you ever taken classes in Audacity, or

19   are you self-taught?

20     A.  Self-taught.

21     Q.  How long did it take you to learn Audacity?

22     A.  Maybe a couple of weeks.  But I'm still

23   learning some of the new features it's coming out with.

24     Q.  Deep program.  Lot's to learn.

25     A.  Can you repeat that?

1        Q.   Okay.  So would you say you stopped posting

2   Destiny 2 content on or around April 2022?

3        A.   Earlier than that.

4        Q.   March?

5        A.   I'd say maybe January.

6        Q.   Okay.  Did you stop because of the situation

7   with the takedowns?

8        A.   Yeah.

9        Q.   Have you ever contemplated going back and

10   posting more Destiny content?

11        A.   I've thought about it.

12        Q.   Tell me what you thought about.

13        A.   I wanted to upload some game play, make a

14   montage sort of thing.

15        Q.   What kind of game play?

16        A.   Like a -- like a headshot only replay.  Stuff

17   like that.

18        Q.   Whenabouts were you contemplating posting this

19   montage or making it?

20        A.   A year ago.

21        Q.   Okay.  So let's talk a little bit about why

22   we're here.  This suit.  Fair to say it's about that

23   circumstance with the -- with the take takedowns?

24        A.   Can you repeat that?

25        Q.   This suit, would it be fair to so say that

1  it's about that situation with the takedowns?

2      A.  Yes.

3      Q.  Did you anticipate this reaction?

4      A.  Not quite.

5      Q.  Tell me more about that.  What did you

6  anticipate?

7      A.  I believed that someone I thought was issuing

8  fraudulent takedowns would be pursued.

9      Q.  Okay.  Are you aware of the response to this

10 situation from other creators in the Destiny community?

11     A.  Yes.

12     Q.  Does their reaction surprise you?

13     A.  No.

14     Q.  Would you say it's fair to characterize that

15 reaction as angry?

16     A.  Yes.

17     Q.  Would you say it's fair to characterize it as

18 sad?

19     A.  Yes.

20     Q.  Tell me about your relationship with YouTube.

21 Have you had trouble with them in the past as far as

22 takedowns?

23     A.  No.

24     Q.  I'm sorry.  Could you repeat that?  That was a

25 little mumbled.

1      A.  No.  None in particular.

2      Q.  So when is the first time you can remember

3  getting a DMCA takedown notice?

4      A.  December of last year.

5      Q.  And are you aware of what the Digital

6  Millennium Copyright Act is?

7      A.  No.

8      Q.  Are you aware of what a Digital Millennium

9  Copyright Act takedown notice is?

10     A.  Yes.

11     Q.  When I say "DMCA notice," can we agree with

12  each other that that's what I'm talking about?

13     A.  Yes.

14     Q.  All right.  Fair enough.  So when all this

15  happened, it started with takedowns; fair to say?

16     A.  Yes.

17     Q.  Tell me about the first one that came in.

18  Tell me about how that made you feel.

19     A.  Confused, angry.

20     Q.  What confused you about it?

21     A.  That I'd receive a takedown notice after the

22  video was uploaded eight years ago.  It struck -- it

23  struck me as odd.

24     Q.  What made you feel angry about it?

25     A.  That it seemed like somebody was just

1 attacking people in the Destiny 2 community, perhaps.

2      Q.  Okay.  So --

3      A.  Yeah.  And that YouTube was not providing any

4 transparency whatsoever.

5      Q.  Were you frustrated with Youtube's lack of

6 transparency?

7      A.  Yes.

8      Q.  Was there anything specific in how YouTube

9 handles this sort of situation that made you most

10 frustrated?

11     A.  I mean, just their complete anonymity that

12 comes with it.

13     Q.  So to clarify, you're referring to the

14 complete anonymity with which somebody can issue a DMCA

15 takedown?

16     A.  Yes.

17     Q.  And an anonymous, to your view, DMCA takedown

18 coming in confused you, frustrated you, made you angry;

19 is that fair to say?

20     A.  Yes.

21     Q.  Would you say it's -- would you say that

22 similar reactions -- let me rephrase.

23         Would you say that you witnessed similar

24 reactions from other creators in the Destiny 2 space

25 when this situation was going down?

1      A.   Yes.

2      Q.   Did you expect that?

3      A.   Yes.

4      Q.   Okay.  How did it make you feel to see that

5   reaction?

6      A.   Remorseful, hopeful.

7      Q.   What made you feel hopeful?

8      A.   That eventually the news would start to spread

9   and Bungie would notice.

10      Q.   So it was not unexpected that your fellow

11   creators were confused, frustrated, and angry, correct?

12      A.   Yes.

13      Q.   Is that what you wanted?

14      A.   No.

15      Q.   What did you want?

16      A.   I wanted Bungie to address the community and

17   be transparent about the takedowns and clarify whether

18   or not they actually issued any.

19      Q.   Did you have doubts about whether or not they

20   had, in fact, issued any?

21      A.   Yes.

22      Q.   So you thought that this would get Bungie's

23   attention?

24      A.   Yes.

25      Q.   And would it be fair to say that that's what

1  you wanted?

2      A.  Yes.

3      Q.  Okay.  All right.  So YouTube let's you know

4  about your first DMCA takedown notice, and it makes you

5  feel confused, frustrated, angry.

6              MR. SCHMEYER:  I'm gonna have -- I'm

7  gonna have Rocco throw up what I have marked as Exhibit

8  H here and I'm going to label it Exhibit 2.

9              (Deposition Exhibit 2 was marked

10                 for identification.)

11     Q.  (BY MR. SCHMEYER)  All right.  This is the

12  Lord Nazo YouTube channel.  Is this your YouTube

13  channel?

14     A.  Yes.

15     Q.  All right.  Do you have any memory of posting

16  this?

17     A.  Yes.

18     Q.  All right.  What -- what are you saying here?

19     A.  Just that I liked the Witch Queen soundtrack.

20     Q.  And you're -- you're getting to work on

21  extending most of the tracks.  By "extending," do you

22  mean the sort of looping that we were discussing

23  earlier?

24     A.  Yeah.  The editing, stuff like that.

25     Q.  Could you break down for me just a little bit

1     Q.  Are the Anime -- are the Anime videos not

2  typically very good performers?

3     A.  Yeah.

4     Q.  But you post the videos because you like the

5  content?

6     A.  Yes.

7     Q.  How -- here's something I'm curious about.

8  How often do you listen to your own mixes, we'll call

9  them?

10     A.  Hours.

11     Q.  Very good.  Do you -- would you say your --

12  your hobby of mixing these tracks together and -- and

13  looping them and creating these mash-ups is something

14  you also do because you love to listen to the music?

15     A.  Yes.

16     Q.  So you're creating content for yourself and

17  not just for other people?

18     A.  Yes.

19     Q.  So there came a point where your channel was

20  shut down, wasn't there?

21     A.  Yes.

22     Q.  Why don't you tell me about what happened.

23     A.  I received the second takedown notification.

24  And so before I could make the effort to prevent any

25  further damage to my account, I was -- I received the

 1  third strike within a few hours.

 2      Q.  Did you -- did you wake up to this issue and

 3  just sort of arrive to it all at once, or did you watch

 4  it unfold over the course of a day or a night?

 5      A.  Can you repeat that?

 6      Q.  Did you wake up to this issue, to your channel

 7  being -- your channel being taken down, or did you

 8  watch this situation unfold over the course of a day or

 9  a night?

10      A.  I basically woke up to it.  Yes.

11      Q.  Yeah.  Were you worried about getting your

12  content restored?

13      A.  No.

14      Q.  What were you worried about?

15      A.  Getting my account restored.

16      Q.  Okay.  Did you think at the time that you'd be

17  able to accomplish that?

18      A.  I don't think so.

19      Q.  Did you resolve to try?

20      A.  Yes.

21      Q.  Tell me the kind of things you were thinking

22  about trying.

23      A.  Contacting YouTube.  I tried contacting the

24  e-mail address that was listed under the takedowns.

25      Q.  Anything else?

1      A.   I tried doing a lot of online research.

2      **Q.   Okay.  What kind of research did you do?**

3      A.   Research on YouTube takedowns and, yeah, just

4   YouTube takedowns in general.

5      **Q.   Where did you look to get your information?**

6   **Did you research forums or more legal-type websites?**

7      A.   Google.  I just used Google.

8      **Q.   And you found advice that you found useful?**

9      A.   Yeah.

10     **Q.   Fair to say once you'd done a little research,**

11  **figured some stuff out, you started taking steps to try**

12  **to get your channel restored?**

13     A.   Yeah.

14     **Q.   Were you successful in getting your channel**

15  **restored?**

16     A.   Yes.

17     **Q.   Whenabouts did you get it put back up?**

18     A.   I can't recall, but I believe it was before

19  June of last year.

20     **Q.   Okay.  What particular action did you take**

21  **that was effective in restoring your channel?**

22     A.   Issuing counter notifications to all of the

23  takedowns.

24     **Q.   Tell me, in your understanding, what a counter**

25  **notification is.**

 1      A.  Basically that the initial DMCA takedown was a

 2  mistake or an error.

 3      Q.  Now, are these counter notices things that you

 4  have to draft up yourself, or is there a form that

 5  YouTube allows you to use?

 6      A.  You have to draft them yourself.

 7      Q.  So where did you learn to draft them yourself?

 8      A.  On the YouTube help website.

 9      Q.  Okay.  So YouTube offers a help website that

10  tells you how to draft counter notifications, and you

11  visited and learned from there; fair to say?

12      A.  Yes.

13      Q.  How many counter notifications did you draft

14  up to send?

15      A.  I believe about five.

16      Q.  How much time did that take you?

17      A.  Probably a couple of days.

18      Q.  Couple of days.  So would you say you were

19  able to kind of borrow a bunch of content from one

20  draft to another, or were all five pretty unique?

21      A.  They were similar, yes.

22      Q.  What made them different to the extent that

23  they were?

24      A.  The different URLs, I guess, that I listed

25  under each counter notification.

1  dispense with that terminology.  And I wanted to ask

2  you when we're talking about them, do you think we can

3  agree to call them "unauthorized" takedowns?

4       A.  Sure.

5       Q.  Okay.  When would you say the idea occurred to

6  you to file unauthorized takedowns?

7       A.  A few weeks after my YouTube channel got

8  terminated.

9       Q.  Tell me how the idea formed.  Tell me how it

10  came about.

11       A.  I believed that I wasn't part -- or a --

12  prominent enough, I guess, in the community.  So if

13  other people were experiencing the same issue, then

14  that would raise attention.

15       Q.  So would it be fair to characterize the

16  genesis of your idea to do this as you wanting to get

17  attention on this issue?

18       A.  Yes.

19       Q.  Had you found YouTube to be particularly

20  helpful up to this point?

21       A.  Not quite.

22       Q.  Not quite.  Can we elaborate on that?  In what

23  ways did you find them helpful?

24       A.  They at least respond to communications.

25       Q.  What ways did you find them not helpful?

1     A.  They would give the same canned responses, for
2  the most part.
3     Q.  Did you suspect the responses were form?
4     A.  Can you repeat that?
5     Q.  I'll repeat and rephrase.
6         Did you speculate that the responses were
7  automatic or form responses; that they weren't actually
8  reading your communications?
9     A.  Yes.
10    Q.  What other ways did you find them ineffective?
11    A.  They seemed to not put as much interest, I
12  guess.
13    Q.  At any point did you sort of have the thought
14  that you're not getting anywhere with YouTube?
15    A.  Yes.
16    Q.  Did you ever lose faith that you would be able
17  to achieve a resolution of the situation with YouTube?
18    A.  Yes.
19    Q.  When you wanted to get attention from the
20  broader community and from Bungie, did you hope that
21  they would help resolve the situation with YouTube?
22    A.  Yes.
23    Q.  And to make sure there's the foundation there
24  -- I skipped over myself a bit.  You wanted to get
25  Bungie's attention as one of your primary objectives,

```
 1  correct?
 2       A.  Yes.
 3       Q.  Did you think if they came to perceive the
 4  problem that you had perceived with fake takedowns
 5  coming from the David Thomson address and others, that
 6  Bungie would take action to fix it?
 7       A.  Yes.
 8       Q.  Why did you believe that?
 9       A.  Because I believed that they cared about their
10  community.
11       Q.  What fostered this -- this perception of
12  caring for their community in you?
13       A.  They -- I mean, they respond to people on
14  Twitter sometimes.
15       Q.  Do you -- did you see their community managers
16  responding to other folks on Twitter?
17       A.  Occasionally, yes.
18       Q.  Folks like Cozmo, DMG?
19       A.  Yeah.
20       Q.  Did you -- let me rephrase.
21           When you witnessed those community managers
22  doing their job and interacting with people in the
23  community who had problems, were you impressed or --
24  yeah.  Were you impressed by -- by their attention, by
25  their ability to get problems resolved?
```

 1      A.  Can you repeat that?

 2      Q.  When you noticed these interactions from

 3  community managers and from Bungie with other consumers

 4  who had problems, did it strike you or was it your

 5  opinion that they did an effective job of responding to

 6  these problems?

 7      A.  I'd say they were at least helpful in the

 8  sense that they were responsive.

 9      Q.  And you hoped if you got the problem that you

10  had perceived in front of them, that they would be

11  helpful and responsive?

12      A.  Yes.

13      Q.  So you decided that to get their attention you

14  would file takedowns of your own, correct?

15      A.  Yes.

16      Q.  I would like to put up a -- I would like to

17  put up one of those as an exhibit right now.  We'll

18  mark it as Exhibit 3.

19              MR. SCHMEYER:  Rocco, if you could put

20  up J for me.

21              (Deposition Exhibit 3 was marked

22               for identification.)

23      Q.  (BY MR. SCHMEYER)  Now I'd like to just walk

24  through some elements of this here, if you don't mind.

25              Look at -- can you -- can you see that okay?

 1  I know some of the -- some of the print's a little

 2  small up top.  Can you read the "From/To" subject lines

 3  all right?

 4      A.  Yeah.

 5      Q.  So that is JeremyWilandCSC@gmail.com, correct?

 6      A.  Yes.

 7      Q.  Did you create that e-mail address?

 8      A.  I'm invoking my Fifth Amendment rights and

 9  refusing to answer.

10      Q.  Okay.  Do you recognize this document?

11      A.  Fifth Amendment.

12      Q.  Okay.

13              MR. SCHMEYER:  You can go ahead and take

14  that exhibit down.

15      Q.  (BY MR. SCHMEYER)  All right.  Are you

16  presently employed by Bungie, Nicholas?

17      A.  No.

18      Q.  Have you ever been employed by Bungie?

19      A.  No.

20      Q.  Have you ever been a contractor for them?

21      A.  No.

22      Q.  Have you ever been employed by the CSC

23  Corporation?

24      A.  No.

25      Q.  Have you ever been contracted by the CSC

1   Corporation?

2       A.  No.

3       Q.  Did you receive, at any point, any permission

4   from Bungie or CSC to file any DMCA takedowns?

5       A.  No.

6       Q.  Have you ever received any authorization from

7   Bungie or CSC to issue any copyright notices of any

8   kind ever?

9       A.  No.

10              MR. SCHMEYER:  All right.  I am going to

11  take a break here, Folks.  I could stand one.  Can we

12  go off the record and be back in 10 minutes?

13              MR. GETZ:  Yep.  10 minutes is fine.

14              MR. SCHMEYER:  Okay.

15              MR. GETZ:  Thank you.

16              MR. SCHMEYER:  Of course.

17              THE VIDEOGRAPHER:  All right.  The time

18  on the monitor is 11:33 a.m. and we are off the record.

19              (Recess taken.)

20              THE VIDEOGRAPHER:  The time on the

21  monitor is 11:43 a.m. and we are back on the record.

22      Q.  (BY MR. SCHMEYER)  All right.  I'm just

23  picking up where we left off, Nicholas.

24          Is Jeremy Wiland a real person?

25      A.  Fifth Amendment.

1      A.  No.

2      Q.  Okay.

3             MR. SCHMEYER:  You can go ahead and take

4  that down for now, Rocco.  Thank you.

5      Q.  (BY MR. SCHMEYER)  All right.  Fair enough.

6         At -- at any point in time, Nicholas, did

7  anybody other than you have access to any of these

8  JeremyWilandCSC@gmail.com and

9  DamianReynoldsCSC@gmail.com e-mail addresses?

10     A.  Fifth Amendment.

11     Q.  Okay.  Would it be fair so say that if a

12 communication or e-mail came from one of these accounts

13 that you sent it?

14     A.  Fifth Amendment.

15     Q.  Are these all the e-mail accounts that you

16 sent takedown notices from?

17     A.  Fifth Amendment.

18     Q.  What is your primary personal e-mail address,

19 Nicholas?

20     A.  PerfectNazo1@gmail.com.

21     Q.  Okay.  Perfect Nazo 1.  Would you say you do

22 the majority or your e-mail correspondence from that

23 account?

24     A.  Yes.

25     Q.  Is that the e-mail you used to register your

 1  Lord Nazo YouTube account?

 2      A.  Yes.

 3      Q.  Is that the e-mail you used to register your

 4  Lord_Nazo Twitter account?

 5      A.  Yes.

 6      Q.  Have you ever sent a DMCA takedown strike from

 7  that e-mail address?

 8      A.  I don't recall.

 9      Q.  Have you ever sent a counter notification, a

10  DMCA counter notice from that e-mail address?

11      A.  Yes.

12      Q.  Would these be the same five counter

13  notifications that we discussed earlier?

14      A.  Fifth Amendment.

15      Q.  Okay.  All right.  Now, when you had takedown

16  notices sent from the David Thomson at CSC e-mail

17  address against your videos, did those videos get taken

18  down as a result of those strikes?

19      A.  Can you repeat the question?

20      Q.  When you received takedown notices from

21  DavidThomsonCSC@gmail.com, were the videos that you

22  received those takedowns for taken down?

23      A.  Yes.

24      Q.  Were they taken down immediately?

25      A.  Yes.

```
 1      Q.  Were all of them taken down immediately?

 2      A.  Define "all of them."

 3      Q.  Every video that was hit with a DMCA takedown

 4  strike from DavidThomsonCSC@gmail.com.

 5      A.  Yes.

 6      Q.  Were any of them put on any sort of time limit

 7  and taken down at a later date?

 8      A.  No.

 9      Q.  Is there anybody else who is involved in this

10  situation with you?

11      A.  Fifth Amendment.

12      Q.  Now, your videos were taken down as a result

13  of DMCA takedown notices, correct?

14      A.  Yes.

15      Q.  Did you intend for the notices you sent to

16  result in videos being taken down?

17      A.  Fifth Amendment.

18      Q.  Did you expect that they would be given

19  warnings before they would be taken down?

20      A.  Yes.

21      Q.  Are you familiar with Aztecross?

22      A.  Yes.

23      Q.  And as you said before, you're familiar with

24  Mynameisbyf?

25      A.  Yes.
```

```
 1        Q.  How are you familiar with them?

 2        A.  Fifth Amendment.

 3        Q.  How long have you known of their accounts?

 4        A.  Fifth Amendment.

 5        Q.  You sent takedown notices to Mynameisbyf and

 6   to Aztecross, correct?

 7        A.  Fifth Amendment.

 8        Q.  Did you target large accounts for these

 9   unauthorized takedown notices intentionally?

10        A.  Fifth Amendment.

11        Q.  Were these large targets with lots of

12   followers attractive targets because you suspected

13   their popularity would afford them a little more leeway

14   and not have their accounts taken down or their videos

15   stricken immediately?

16        A.  Fifth Amendment.

17        Q.  When did you first become aware of the public

18   reaction to all of this?

19        A.  Fifth Amendment.

20        Q.  When did you become aware of the community

21   reaction to all of this; specifically Destiny 2 content

22   creators?

23        A.  Fifth Amendment.

24        Q.  When did you become aware that Bungie had

25   taken notice of all this?
```

**BUNGIE INC. vs NICHOLAS MINOR**
Nicholas Minor on 07/20/2023                          Page 62

```
 1        A.  Fifth Amendment.

 2        Q.  All right.

 3                MR. SCHMEYER:  I would like to throw an

 4   exhibit up as Exhibit 5.

 5             Rocco, that will be my Exhibit L.

 6                (Deposition Exhibit 5 was marked

 7                 for identification.)

 8        Q.  (BY MR. SCHMEYER)  I want you to go ahead and

 9   take a look at this, Nicholas, for just a couple

10   seconds here.

11                (Witness reviewing document.)

12        Q.  (BY MR. SCHMEYER)  All right.  Did you file

13   this?

14        A.  Fifth Amendment.

15        Q.  Why did you file counter notices after you had

16   filed unauthorized takedowns?

17        A.  Fifth Amendment.

18        Q.  Were you aware that Bungie was pledging to

19   help anybody who had their content taken down by

20   unauthorized takedowns get their content back up?

21        A.  Fifth Amendment.

22        Q.  At any point did you come to the conclusion or

23   form the opinion that Bungie would help you get your

24   content put back up?

25        A.  Fifth Amendment.
```

1      Q.  Okay.

2              MR. SCHMEYER:  You can go ahead and take

3   that down, Rocco, if you would.  And I will -- I will

4   throw something right back up.  Sorry.

5          I'd like to throw up as Exhibit 6 here what I

6   have marked Exhibit N, Rocco.

7                  THE VIDEOGRAPHER:  Did you say M or N?

8                  MR. SCHMEYER:  Oh, I beg your pardon, N.

9                  THE VIDEOGRAPHER:  N, okay.  Thank you.

10                 (Deposition Exhibit 6 was marked

11                  for identification.)

12     Q.  (BY MR. SCHMEYER)  All right.  I'd like you to

13  take a look at this, Nick.  And when you have read it,

14  let me know and we will scroll down.

15     A.  You can scroll.

16     Q.  Stay for this page?

17     A.  Yes.  You can scroll down.

18                 THE VIDEOGRAPHER:  That's the last page.

19                 MR. SCHMEYER:  Okay.  Very good.

20     Q.  (BY MR. SCHMEYER)  Do these -- do you

21  recognize these?

22     A.  Fifth Amendment.

23     Q.  Okay.  Are these your statements, Nicholas?

24     A.  Fifth Amendment.

25     Q.  At any point were you trying to use the

1  community reaction to unauthorized takedowns to try to

2  get Bungie to assist you in getting your content put

3  back up?

4      A.  Fifth Amendment.

5      Q.  Were you ever trying to use your own

6  unauthorized takedowns and the fear they inspired to

7  get Bungie to assist you in putting your content back

8  up?

9      A.  Can you repeat the question?

10     Q.  Did you ever try to use your own unauthorized

11  takedowns and the reaction they inspired to get Bungie

12  to assist you in getting your content back up?

13     A.  Fifth Amendment.

14     Q.  Do you have a Discord account?

15     A.  Yes.

16     Q.  What is your Discord username?

17     A.  I can't recall.

18     Q.  Is your Discord username Lord Nazo?

19     A.  Fifth Amendment.

20     Q.  All right.

21          MR. SCHMEYER:  You can go ahead and take

22  that down, Rocco.  Okay.  And we're gonna throw

23  something else up.  If you could throw up what I have

24  marked as Exhibit O, Rocco.

25          Pardon me.  I lost my pen.

**BUNGIE INC. vs NICHOLAS MINOR**
Nicholas Minor on 07/20/2023                                    Page 65

1            I'm going to mark that as Exhibit 7.

2                  (Deposition Exhibit 7 was marked

3                  for identification.)

4     Q.  (BY MR. SCHMEYER)  Do you recognize this?

5     A.  Fifth Amendment.

6     Q.  You -- you testified earlier that your Twitter

7  username was @Lord_Nazo, correct?

8     A.  Fifth Amendment.

9     Q.  Do you recall sending this Tweet?

10     A.  Fifth Amendment.

11     Q.  All right.  Were you hoping that the

12  controversy you were inspiring with your unauthorized

13  takedowns would convince YouTube to take action on your

14  account?

15     A.  Fifth Amendment.

16     Q.  Did you think that YouTube would take action

17  on your account?

18     A.  Fifth Amendment.

19     Q.  Okay.  Did you at any point have a right to

20  send takedown notices on behalf of Bungie?

21     A.  Fifth Amendment.

22     Q.  Did you ever think you did?

23     A.  Fifth Amendment.

24                  MR. SCHMEYER:  All right.  You can take

25  that down, Rocco.  And we're back after it again.  I

```
 1  want to show him something else.  If we could throw up

 2  Exhibit P, please, that I will mark here for the depo

 3  as Exhibit 8.

 4                  (Deposition Exhibit 8 was marked

 5                   for identification.)

 6      Q.  (BY MR. SCHMEYER)  You testified earlier that

 7  Lord Nazo was your YouTube account, correct?

 8      A.  Wait.  Can you repeat the question?

 9      Q.  You testified earlier this morning that

10  Lord Nazo was your YouTube account, correct?

11      A.  Yes.

12      Q.  Is this your YouTube account, Nicholas?

13      A.  Fifth Amendment.

14      Q.  Okay.  This is a post from your community tab

15  of your YouTube channel, and it says that this won't be

16  the end.  The end of what?

17      A.  Fifth Amendment.

18      Q.  You mention here that you might upload -- or,

19  I'm sorry, offload your deleted videos to a different

20  location.  Is this your only YouTube channel, Nick?

21      A.  Fifth Amendment.

22      Q.  Were you thinking about making another YouTube

23  channel?

24      A.  Fifth Amendment.

25      Q.  Have you ever considered making another
```

```
 1  YouTube channel?

 2      A.  Fifth Amendment.

 3      Q.  And on that alternate channel, would you post

 4  the same types of content?

 5      A.  Fifth Amendment.

 6      Q.  Would you upload your stricken videos to that

 7  alternate YouTube channel?

 8      A.  Fifth Amendment.

 9              MR. SCHMEYER:  You can take that down,

10  Rocco.

11      Q.  (BY MR. SCHMEYER)  We've seen a number of

12  posts by Lord Nazo.  Do you know of any other

13  Lord Nazos?

14      A.  Fifth Amendment.

15      Q.  Did you use the same profile picture for all

16  of your accounts?

17      A.  Fifth Amendment.

18      Q.  Did you assume that you were anonymous,

19  Nicholas?

20      A.  Fifth Amendment.

21      Q.  Did you assume that there was no way to --

22  there was no way to catch you?

23      A.  Fifth Amendment.

24      Q.  What steps do you take to maintain anonymity

25  on the internet?
```

1        A.  Fifth Amendment.

2        Q.  All right.  Moving on.  All right.  I'm gonna

3   ask you some -- some questions about the soundtracks

4   that you -- you like to post to your YouTube account.

5            Did you -- do you post songs from the original

6   soundtrack of The Taken King, an expansion to the

7   original Destiny game?

8        A.  Yes.

9        Q.  Did you post songs from the original

10  soundtrack of the Destiny: Rise of Iron expansion?

11       A.  Yes.

12       Q.  Did you post songs from the original

13  soundtrack of Destiny 2?

14       A.  Yes.

15       Q.  Did you post songs from the original

16  soundtrack from the Forsaken expansion?

17       A.  Yes.

18       Q.  Did you post songs from the original

19  soundtrack of the Shadowkeep expansion?

20       A.  Yes.

21       Q.  Did post songs from the original soundtrack of

22  the Beyond Light expansion?

23       A.  Yes.

24       Q.  Did post songs from the original soundtrack of

25  the Witch Queen expansion?

```
 1                    MR. SCHMEYER:  2022, I meant.  I am so
 2   sorry.
 3        Q.  (BY MR. SCHMEYER)  On March 2nd -- 22nd,
 4   2022 -- I beg your pardon -- do you recall sending out
 5   any communications?
 6        A.  I don't recall.
 7        Q.  Do you recall sending out any communications
 8   explaining what you did?
 9        A.  I can't recall.
10        Q.  Okay.  It's okay.  I have it here.  It's not a
11   memory test.  One moment.
12                    MR. SCHMEYER:  Rocco, could we throw up
13   my Exhibit W.  I'm going to mark that as Exhibit 9.
14                    (Deposition Exhibit 9 was marked
15                     for identification.)
16        Q.  (BY MR. SCHMEYER)  All right.  Do you
17   recognize this?
18        A.  Fifth Amendment.
19        Q.  Okay.  Why -- what were you hoping to
20   accomplish with writing this?
21        A.  Fifth Amendment.
22        Q.  Were you hoping to convince the public to
23   support what you were doing?
24        A.  Fifth Amendment.
25        Q.  Were you hoping to convince the public that
```

 1   David Thomson was a fraudulent e-mail address?

 2       A.   Fifth Amendment.

 3       Q.   Were you trying to convince readers that the

 4   takedowns David Thomson had been sending were

 5   fraudulent?

 6       A.   Fifth Amendment.

 7       Q.   Were you hoping that Bungie would read this?

 8       A.   Fifth Amendment.

 9       Q.   Were you hoping that after they read it that

10   they would take actions to help you get your content

11   restored and to help others get their content restored?

12       A.   Fifth Amendment.

13       Q.   Were you hoping this would get press

14   attention?

15       A.   Fifth Amendment.

16       Q.   Were you hoping this would go viral on social

17   media?

18       A.   Fifth Amendment.

19       Q.   Were you hoping that this would dull community

20   anger to what was happening to them?

21       A.   Fifth Amendment.

22       Q.   Okay.

23            MR. SCHMEYER:   You can -- you can take

24   that down, Rocco.   Okay.

25            All right.   I would like to -- actually, one

1  here -- I just left my pen.  One second.

2           For Exhibit 11, Rocco, I want to throw up what

3  I labeled as Q.  Once again, thank you for bearing with

4  me.

5                (Deposition Exhibit 11 was marked

6                 for identification.)

7      Q.  (BY MR. SCHMEYER)  All right.  Do you

8  recognize this Tweet, Nicholas?

9      A.  Yes.

10     Q.  Do you recall sending this Tweet, Nicholas?

11     A.  Fifth Amendment.

12     Q.  When you say, "Except it's not actually Bungie

13 who is going after them," what did you mean?  Who was

14 "them"?

15     A.  Fifth Amendment.

16     Q.  Okay.  Was the third-party brand protection

17 service that you're referring to here, is that CSC?  Is

18 that who you meant?

19     A.  Fifth Amendment.

20     Q.  Okay.  You denied that the

21 JeremyWilandCSC@gmail.com account sent that first

22 unauthorized DMCA takedown notice on February 5th of

23 2022.  Why?

24     A.  Fifth Amendment.

25                MR. SCHMEYER:  All right.  We can take

 1  that down, Rocco.  And I'd like to throw something else

 2  up.  This will be Exhibit 11, and it will be my label

 3  R.

 4                    THE VIDEOGRAPHER:  This will be 12,

 5  actually.

 6                    MR. SCHMEYER:  Oh, well, right on.  All

 7  right.  Thank you.  And that is why we leave it to the

 8  pros.

 9                    (Deposition Exhibit 12 was marked

10                     for identification.)

11      Q.  (BY MR. SCHMEYER)  All right.  Do you

12  recognize this Tweet, Nicholas?

13      A.  Yes.

14      Q.  Did you send this Tweet, Nicholas?

15      A.  Fifth Amendment.

16      Q.  And when -- when you were asked -- when you

17  were talking about something getting out of hand, what

18  did you mean?

19      A.  Fifth Amendment.

20      Q.  Okay.

21                    MR. SCHMEYER:  You can take that down.

22      Q.  (BY MR. SCHMEYER)  Did you submit a takedown

23  request from the JacobAverz -- Averz@gmail.com account?

24      A.  Fifth Amendment.

25      Q.  The takedown that was sent from the Jacob

 1  Averz Gmail account was signed Damian Reynolds.  Did

 2  you -- did you sign this takedown Damian Reynolds?

 3      A.  Fifth Amendment.

 4      Q.  Was that an accident?

 5      A.  Fifth Amendment.

 6              MR. SCHMEYER:  Can we -- can we throw up

 7  real quick as Exhibit 13, what I have labeled S.

 8              (Deposition Exhibit 13 was marked

 9               for identification.)

10      Q.  (BY MR. SCHMEYER)  Did you intend to send that

11  takedown from the Damian Reynolds account?

12      A.  Fifth Amendment.

13      Q.  Do you recognize that takedown?

14      A.  I can't recall.

15      Q.  Okay.  Could there have been any other reason

16  that you could've had for submitting a takedown from

17  Jacob Averz as Damian Reynolds?

18      A.  Fifth Amendment.

19      Q.  Could anybody else have written that takedown?

20      A.  Fifth Amendment.

21      Q.  Could you explain for me why you would deny

22  writing that takedown notice in your answer?

23      A.  Fifth Amendment.

24      Q.  So the Damian Reynolds account submitted an

25  identical notice on that very same video right after

1  the Jacob Averz account did.  Was this you?

2      A.  Fifth Amendment.

3      Q.  Were you trying to fix a mistake?

4      A.  Fifth Amendment.

5      Q.  Did somebody else file that second takedown

6  notice?

7      A.  Fifth Amendment.

8      Q.  Now, is it correct that YouTube asked you at

9  one point to provide documentation of your authority to

10  submit these requests?

11      A.  Something to that extent, I guess.

12      Q.  Do you recall in your recollection -- let me

13  rephrase.

14          In your recollection, do you recall what they

15  asked you?

16      A.  They said I could provide a website URL.

17      Q.  A website URL to what purpose?

18      A.  What do you mean by that?

19      Q.  What was the website URL to, or what did they

20  want it to represent?

21      A.  The company that was filing the takedown, I

22  believe.

23      Q.  So is it fair to say they wanted you to submit

24  a URL that could serve as some form of credential?

25      A.  Yes.

1      Q.  Okay.  What requests flagged this particular
2  response from YouTube?
3      A.  Fifth Amendment.
4              MR. SCHMEYER:  You can go ahead and take
5  that down, Rocco.  Thank you.
6      Q.  (BY MR. SCHMEYER)  All right.  Now, when
7  YouTube asked you to provide documentation of your
8  authority to submit these requests, you responded by
9  retracting your takedown notices, correct?
10      A.  Fifth Amendment.
11      Q.  Okay.  Now, were you worried about getting
12  caught?
13      A.  Fifth Amendment.
14      Q.  What was your reaction when YouTube asked you
15  to provide documentation of your authority to submit
16  those requests?
17      A.  Fifth Amendment.
18      Q.  Why didn't you send YouTube any further proof
19  of authority from Bungie?
20      A.  Fifth Amendment.
21      Q.  Why didn't you send YouTube any further proof
22  of authority from CSC Corporation?
23      A.  Fifth Amendment.
24      Q.  At any point did you consider inventing
25  credentials or something like you had the e-mail

1  addresses?

2      A.  Fifth Amendment.

3      Q.  You'd already identified yours yourself as

4  CSC, correct?

5      A.  Fifth Amendment.

6      Q.  You provided their corporate website, an

7  actual address, a phone number.  And you claimed I was

8  part of CSC entertainment; is that correct?

9      A.  Fifth Amendment.

10     Q.  Did you think at this point when a good idea

11 to stop might be?

12     A.  Fifth Amendment.

13     Q.  So YouTube asked for proof of authority on

14 March 18th, 2022.  Does that sound right?

15     A.  I can't recall.

16     Q.  That same day you sent another five

17 unauthorized takedowns from Jeremy Wiland, correct?

18     A.  Fifth Amendment.

19     Q.  The next day, that would be March 19th, 2022,

20 Google received 53 takedown notices from these accounts

21 we've been discussing.  Did you send those?

22     A.  Fifth Amendment.

23     Q.  In total, you sent 96 different notices

24 targeting 95 videos; is that correct?

25     A.  Fifth Amendment.

1      Q.   Is there any reason why you denied that in

2   your answer?

3      A.   Fifth Amendment.

4      Q.   Do you -- did anyone else send any of these

5   unauthorized takedowns?

6      A.   Fifth Amendment.

7      Q.   Do you know the account The Phoenix?

8      A.   I can't recall.

9      Q.   How about Promethean and Archival Mind?

10     A.   Yes.

11     Q.   How do you know Promethean and Archival Mind?

12     A.   Fifth Amendment.

13     Q.   Do you know the account Azod_FR?

14     A.   Doesn't sound -- doesn't ring a bell.  I can't

15   recall.

16     Q.   These -- these were some of the -- some of the

17   accounts that got hit with these unauthorized takedown

18   notices.  Did you hit these accounts with unauthorized

19   takedown notices?

20     A.   Fifth Amendment.

21     Q.   Their smaller than Byf and Aztecross, Orders

22   of Magnitude.  How did you decide that you'd hit them

23   with unauthorized takedowns too?

24     A.   Fifth Amendment.

25     Q.   Did you select at random?

1        A.   Fifth Amendment.

2        Q.   Do you know any of these accounts we've talked

3    about personally?

4        A.   Fifth Amendment.

5        Q.   Have you ever interacted with them on social

6    media or Discord?

7        A.   Fifth Amendment.

8        Q.   Is the fact that you knew each other in any

9    way part of the reason you chose to send unauthorized

10   takedowns to their accounts?

11       A.   Fifth Amendment.

12       Q.   Would say it's fair to say that social

13   proximity inspired you to hit them with unauthorized

14   takedown requests?

15       A.   Fifth Amendment.

16       Q.   Do you remember hitting Bungie's official

17   YouTube with a DMCA takedown?

18       A.   Fifth Amendment.

19       Q.   Is there a reason why you'd go after Bungie

20   themselves?

21       A.   Fifth Amendment.

22       Q.   Did you go after Bungie themselves to get

23   their attention and to draw their attention to this

24   issue?

25       A.   Fifth Amendment.

1      Q.  Do you deny that videos got taken down as a

2  result of the takedowns you sent?

3      A.  Fifth Amendment.

4      Q.  Did you file any unauthorized takedown notices

5  to your own account?

6      A.  Fifth Amendment.

7      Q.  Did you file any unauthorized notices to your

8  own account from the JeremyWilandCSC@gmail.com address?

9      A.  Fifth Amendment.

10     Q.  Did you send YouTube counter notifications for

11 your own DMCA strikes around the time this was

12 happening?

13     A.  Fifth Amendment.

14     Q.  What was the basis for those counter notices?

15     A.  Fifth Amendment?

16     Q.  In those counter notices, did you contend that

17 somebody else submitted a fraudulent takedown notice

18 against your account?

19     A.  Fifth Amendment.

20     Q.  So would you say it's fair to say that the

21 only person who was submitting unauthorized takedown

22 notices at this time was you?

23     A.  Fifth Amendment.

24     Q.  Was this sort of an act of civil disobedience

25 on your part?

1       A.   Fifth Amendment.

2       Q.   Was it an attempt to address by example what

3   you thought was an unfair process at YouTube?

4       A.   Fifth amendment.

5       Q.   Was it an attempt to address what you thought

6   was negligence on the part of Bungie?

7       A.   Fifth Amendment.

8       Q.   Was it an attempt to address what you saw as

9   ignorance on the part of Bungie?

10      A.   Fifth Amendment.

11      Q.   All right.   So is it true that in your own

12  DMCA takedown requests -- or in your own -- pardon me.

13  Let me rephrase.

14           Is it true in your own counter notices that

15  you reference your own unauthorized takedown requests

16  as well as Bungie's public statements about them?

17      A.   Fifth amendment.

18      Q.   Was that in an effort to get your videos put

19  back up?

20      A.   Fifth Amendment.

21      Q.   How much of this entire sequence of events

22  was, as a percentage, an attempt for you to get your

23  videos put back up?

24      A.   Fifth Amendment.

25           MR. SCHMEYER:   Could we throw up as

1  Exhibit 14 what I marked as T, Rocco.

2                    (Deposition Exhibit 14 was marked

3                    for identification.)

4        Q.  (BY MR. SCHMEYER)  All right.  Do you

5  recognize this, Nicholas?

6        A.  Yes.

7        Q.  Did you send this Tweet, Nicholas?

8        A.  Fifth Amendment.

9        Q.  Could anyone else have sent this Tweet,

10  Nicholas?

11       A.  Fifth Amendment.

12       Q.  What did you mean by Bungie or CSC is out of

13  control?

14       A.  Fifth Amendment.

15       Q.  You tag community managers and Bungie

16  themselves.  Why?

17       A.  Fifth Amendment.

18       Q.  All right.

19                    MR. SCHMEYER:  You can go ahead and take

20  that down, Rocco.  All right.  Let me take a look at

21  something here real quick.  I beg your pardon.  We're

22  gonna throw up -- were gonna throw up another exhibit

23  here, Rocco.  3 just looking up which one it is on my

24  list.  Yes.  Could we throw up Exhibit U.  And I'll

25  mark that as Exhibit No. 15.

```
 1                    (Deposition Exhibit 15 was marked

 2                      for identification.)

 3      Q.  (BY MR. SCHMEYER)  Do either of these posts

 4  look familiar, Nicholas?

 5      A.  I don't recall.

 6      Q.  Is your Reddit account Lord Nazo?

 7      A.  Yes.

 8              MR. SCHMEYER:  Could we -- real quick,

 9  could we take that down, Rocco, and put up B.  And I'll

10  mark that as Exhibit 16.

11                    (Deposition Exhibit 16 was marked

12                      for identification.)

13      Q.  (BY MR. SCHMEYER)  So this is the source code

14  for those posts, and it represents that the user was

15  Lord Nazo.  Does that refresh your recollection at all?

16      A.  (Nonverbal response.)

17      Q.  All good.

18              MR. SCHMEYER:  Can you we take that down

19  and bring U back up.

20      Q.  (BY MR. SCHMEYER)  Did you write these Reddit

21  posts, Nicholas?

22      A.  Fifth Amendment.

23      Q.  Why were you posting all this -- all this

24  stuff on Reddit?

25      A.  Fifth Amendment.
```

```
1         Q.  Did you write other Reddit posts where you

2   said that while this wasn't the best way to get

3   Bungie's attention, you at least now had a chance to

4   get your channel restored?

5         A.  Fifth Amendment.

6              MR. SCHMEYER:  So we're gonna take that

7   down, Rocco.  And as Exhibit 17, I'd like you to put up

8   X.  Oh, well look at that.  That's a problem.  One

9   moment.  Let me see if I can fix that.

10          Let's go off the record for a moment if we

11  could.

12             THE VIDEOGRAPHER:  Okay.  The time on

13  the monitor is 1:47 p.m.  We are off the record.

14             (Pause in the proceeding.)

15             THE VIDEOGRAPHER:  The time on the

16  monitor 1:  49 p.m. and we are back on the record.

17             MR. SCHMEYER:  Okay.  I beg your pardon.

18  I uploaded a defective exhibit and have corrected that,

19  and now we have -- we have the correct exhibit on the

20  screen as Exhibit 17.

21             (Deposition Exhibit 17 was marked

22               for identification.)

23        Q.  (BY MR. SCHMEYER)  Do you recognize this

24  e-mail, Nicholas?

25        A.  Yes.
```

```
 1        Q.   Why did you send this?

 2        A.   Fifth Amendment.

 3        Q.   Is Minor.n.personal@gmail.com, which you'll

 4   see is the e-mail in the "From" line there, your e-mail

 5   address?

 6        A.   Fifth Amendment.

 7        Q.   Is this the e-mail address associated with

 8   your Lord Nazo YouTube account?

 9        A.   Fifth Amendment.

10        Q.   What e-mail address, again, was your YouTube

11   channel associated with?

12        A.   PerfectNazo1@gmail.com.

13        Q.   Why did you send this e-mail from this address

14   and not PerfectNazo01 [sic]?

15        A.   Fifth Amendment.

16        Q.   Did you create this e-mail account

17   specifically to send this e-mail?

18        A.   Fifth Amendment.

19        Q.   And did you use this e-mail as opposed to

20   PerfectNazo01 in an effort to obfuscate your connection

21   with PerfectNazo01?

22        A.   Fifth Amendment.

23        Q.   When did you create this Minor.n.personal

24   Gmail account?

25        A.   Fifth Amendment.
```

1        Q.  Do you use this e-mail account for any

2   account?

3        A.  Fifth Amendment.

4        Q.  Do you mention in this e-mail the Lord Nazo

5   YouTube account at all?

6        A.  Fifth Amendment.

7        Q.  Why not?

8        A.  Fifth Amendment.

9        Q.  Did anything in particular prompt you to send

10  this e-mail?

11       A.  Fifth Amendment.

12       Q.  What did you want to communicate to Bungie's

13  legal team with this e-mail?

14       A.  Fifth Amendment.

15       Q.  You ID yourself in this e-mail as one of the

16  Does, but you said that you suspected you were the only

17  one.  Why?

18       A.  Fifth Amendment.

19       Q.  In this communication and in the communication

20  that we called in the -- we called in the compliant the

21  manifesto, you don't mention Lord Nazo at all.  Why

22  not?

23       A.  Fifth Amendment.

24       Q.  So you say here that -- you said that the

25  manifesto e-mail was intended to be an explanation of

```
 1  all of this.  Is that manifesto e-mail that this e-mail
 2  is referring to the same one we discussed earlier?
 3      A.  Fifth Amendment.
 4      Q.  Were you set up, Nicholas?
 5      A.  Fifth Amendment.
 6      Q.  Did somebody else send this confession e-mail?
 7      A.  Fifth Amendment.
 8      Q.  Okay.  Did you send this e-mail in an effort
 9  to take responsibility for what you had done?
10      A.  Fifth Amendment.
11      Q.  Did you send this e-mail as a first step in
12  trying to make it right?
13      A.  Fifth Amendment.
14      Q.  Okay.
15          MR. SCHMEYER:  You can take it down,
16  Rocco.  Thank you.  And we're getting there.
17          I need another thrown up as exhibit -- I
18  believe this would be 18.  And you can pull -- it's Y.
19  Exhibit Y for 18 for me, Rocco.
20              (Deposition Exhibit 18 was marked
21               for identification.)
22      Q.  (BY MR. SCHMEYER)  Does this look familiar,
23  Nicholas?
24      A.  Yes.
25      Q.  Did you send this?
```

1        A.   Fifth Amendment.

2        Q.   This e-mail says, "Hope striking everyone's

3   content was worth it.  If I were you I'd delete my

4   Google account.  Bungie and probably even Google are

5   going to come after you."  Why did you send this to

6   DavidThomsonCSC@gmail.com?

7        A.   Fifth Amendment.

8        Q.   All right.  Were you trying to get a response

9   out of David Thomson?

10        A.   Fifth Amendment.

11        Q.   Did you think that maybe he would admit that

12   he had done this to you too?

13        A.   Fifth Amendment.

14        Q.   Okay.  All right.  So in summation, let me see

15   if I understand what we've discussed and what you've

16   been able to tell me correctly.  So it's fair to say

17   that you're a gamer who likes and liked playing Destiny

18   and Destiny 2, yeah?

19        A.   Yes.

20        Q.   Fair to say that you were sick of Youtube's

21   terrible IP enforcement mechanisms?

22        A.   Yes.

23        Q.   Fair to say that you thought they were unfair?

24        A.   Yes.

25        Q.   You -- did you get content strikes that made